E-FILED
Friday, 03 January, 2014  09:02:30 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| ALAN BEAMAN, )<br><br>Plaintiff, )<br><br>v. )<br><br>JAMES SOUK, CHARLES REYNARD,<br>TIM FREESMEYER, ROB<br>HOSPELHORN, DAVE WARNER, JOHN<br>BROWN, FRANK ZAYAS, MCLEAN<br>COUNTY ILLINOIS, and TOWN OF<br>NORMAL ILLINOIS, )<br><br>Defendants. ) | Case No.   10-cv-1019 |

# O R D E R   &   O P I N I O N

This matter is before the Court on the Motion for Summary Judgment (Doc. 109), filed by Defendants Tim Freesmeyer, Dave Warner, Frank Zayas, and Town of Normal, Illinois.[1] Plaintiff has filed a Response (Doc. 127), and Defendants filed a Reply (Doc. 134). For the reasons stated below, Defendants' Motion is granted.

## PROCEDURAL HISTORY

Plaintiff filed a Complaint on January 26, 2010, containing allegations of various legal wrongs in connection with Plaintiff's recently-overturned 1995 conviction for the murder of Jennifer Lockmiller. Plaintiff raised both federal and state law claims against prosecutors, police officers, and two municipalities for their

---

[1] Defendant Rob Hospelhorn was also named as a filer, but he has since been dismissed as a defendant. (Docket entries dated Aug. 27, 2013). Additionally, there is a pending Motion for Summary Judgment (Doc. 97) filed by Defendants John Brown and McLean County, Illinois, but these defendants have also been dismissed. Thus, that Motion is moot.

roles in the investigation and prosecution. Defendants' initial Motions to Dismiss were granted in part and denied in part. (Doc. 48). Count I, a claim under 42 U.S.C. § 1983 for failure to disclose exculpatory information, was dismissed as to Defendants Souk and Reynard on the basis of immunity, and the Court limited this count as to other Defendants in that Plaintiff could not claim that evidence of certain "bypass route" time trials, discussed in more detail below, was exculpatory evidence whose nondisclosure violated his rights. (Doc. 48 at 30). Plaintiff's respondeat superior claim against McLean County was also dismissed. (Doc. 48 at 30). The Court also dismissed other claims, but without prejudice, and Plaintiff was granted leave to file an amended complaint. (Doc. 48 at 30-31). Plaintiff then filed his Amended Complaint (Doc. 50), and Defendants' second Motion to Dismiss was denied. (Doc. 68). However, two additional counts were dismissed as to Defendants Souk and Reynard, and the Court ordered Plaintiff to file a Second Amended Complaint to remove previously dismissed claims for clarity. (Doc. 68 at 30).

Subsequently, Defendants Souk and Reynard were dismissed entirely from the case pursuant to an agreed motion. (Docket entries dated July 12, 2013). Defendants John Brown, Rob Hospelhorn, and McLean County, Illinois, were also dismissed pursuant to a voluntary dismissal. (Docket entries dated Aug. 27, 2013). Thus, only police officers Tim Freesmeyer, Dave Warner, and Frank Zayas, as well as their employer, the Town of Normal, Illinois, remain as Defendants in this case.[2]

The operative pleading, the Second Amended Complaint (Doc. 69), raises eight claims. Count I is a claim brought pursuant to 42 U.S.C. § 1983 that

---

[2] As such, all future references to "Defendants" refer to only these remaining Defendants unless otherwise noted.

2

Defendants violated Plaintiff's constitutional rights by withholding exculpatory information from him, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Count II is a conspiracy claim, alleging that Defendants and others conspired to conceal the information, and Count III alleges liability for failure to intervene to correct these constitutional violations. Count IV is a state law malicious prosecution claim, Count V alleges a state law civil conspiracy claim, and Count VI states a claim for intentional infliction of emotional distress under state law. Each of these six claims is stated against the three remaining individual Defendants, Freesmeyer, Warner, and Zayas. Against the Town of Normal, Plaintiff alleges respondeat superior liability in Count VII, and state law indemnification of the officers' liability in Count VIII.

## SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). All inferences drawn from the facts must be construed in favor of the non-movant. *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011).

To survive summary judgment, the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which he bears the burden of proof at trial." *Warsco v. Preferred Technical Grp.*, 258 F.3d 557, 563 (7th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If the evidence on

record could not lead a reasonable jury to find for the non-movant, then no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *See McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997). At the summary judgment stage, the court may not resolve issues of fact; disputed material facts must be left for resolution at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

### Factual Background[3]

Jennifer Lockmiller was found dead in her apartment in Normal, Illinois, on August 28, 1993. Lockmiller had been strangled with an alarm clock cord and stabbed in the chest with scissors. Strangulation was determined to be the cause of death. She and Plaintiff Alan Beaman had both been students at Illinois State University, and had been romantically involved in the past. After an investigation, Plaintiff was arrested and charged with murder. Plaintiff was convicted of this high-profile murder on April 1, 1995.

After his conviction, Plaintiff was sentenced to fifty years in prison. However, in 2008, the Illinois Supreme Court vacated Plaintiff's conviction on the basis of due process violations under *Brady*, because evidence concerning an alternative suspect, identified only as John Doe in the opinion but now identified as Larbi John Murray, was not disclosed to Plaintiff. *People v. Beaman*, 890 N.E.2d 500 (Ill. 2008). Recently, on April 29, 2013, the Circuit Court for the Eleventh Judicial District in

---

[3] Unless otherwise indicated, these background facts reflect the Court's determination of the undisputed facts, and are drawn from the parties' statements of facts filed regarding the Motion for Summary Judgment. (Docs. 111, 127, 133). "Disputes" that facts are mischaracterized or out of context are not genuine disputes. All genuine factual disputes and reasonable inferences are taken in Plaintiff's favor, as noted above.

Bloomington, Illinois awarded Plaintiff a Certificate of Innocence under a state law provision. Plaintiff now raises claims against certain individuals involved in the investigation and prosecution, alleging violations of his constitutional rights and state tort law.

***Investigation Team***

The primary investigators of the Lockmiller murder were officers of the Town of Normal Police Department (NPD), particularly those officers involved in the Criminal Investigations Division (CID).

Defendant Tim Freesmeyer was a detective in the CID during the investigation. He was the principal detective initially responsible for investigating Plaintiff. As early as October or November 1993, he took on a leadership role with the murder investigation, and eventually was the principal investigator for the entire case.

Defendant Dave Warner of the NPD worked as an evidence custodian during the investigation. This entailed preparing paperwork and taking evidence to and from the lab. He was also responsible for investigating one of the other suspects that was initially considered, Stacey "Bubba" Gates.

Defendant Frank Zayas was the lieutenant in charge of the CID during the investigation, until his retirement in November 1994.[4] In this role, he supervised the detectives working on the case. One of his duties was ensuring the State's

---

[4] Confusingly, there is a dispute about whether or not Zayas was in this role for this entire period. Defendants claim he was reassigned away from the CID between February and June 1994, but Plaintiff asserts he was not. (Doc. 127 at 80). This discrepancy does not appear to be material, however, as whether or not he was in charge of the CID, there is no dispute that he was involved with certain aspects of the investigation during that time.

Attorneys' Office (SAO) received investigatory documents. He typically fulfilled this duty by giving documents to the NPD records section to be placed in the central file, and the records section would then send a copy to the SAO. This included documents such as police reports, polygraph reports, interview transcripts, and working files.

Tony Daniels, not a party to this lawsuit, was also a detective in the CID during the investigation, taking over as head of the CID after Zayas retired in November 1994. Daniels was initially the principal investigator for the murder, but he was removed and replaced by Freesmeyer as early as October or November 1993. Rob Hospelhorn, who has been dismissed as a Defendant, worked as a detective in the CID with Freesmeyer for a short time during the investigation. He was not involved in the investigation after early October 1993.

Charles Reynard was the elected State's Attorney for McLean County at the time of the investigation and prosecution. James Souk was the Chief of the Felony Division in the SAO and was the lead prosecutor of Plaintiff's criminal case. John Brown was an employee of McLean County and assisted the SAO with the investigation.

***Investigative Process***

The investigators collaborated in their efforts, and met periodically to discuss the investigation. Reports show at least nine investigators' meetings were held during the course of the investigation, the purpose of which, according to officers, was to share information and assignments and discuss progress. Additionally, most of the detectives worked in cubicles, which allowed for communication and

information sharing. Officers were required to read reports from other officers to stay informed of the investigation.

Prosecutor Souk attended at least five of the investigators' meetings, including a four-and-a-half hour meeting the day after the body was found. There was "constant contact" between the investigators and prosecutors, with a "high level of collaboration," and Freesmeyer and Souk consulted frequently prior to charging Plaintiff with the murder. (Doc. 133 at 52). Further, the State's Attorneys provided feedback on police reports. As described by Defendant Freesmeyer in deposition testimony, Souk had authority over the investigation, even though not in an official hierarchy.

Under normal procedure, detectives gave reports to Zayas, who would review them and give a copy to the Police Chief, a copy to the records section, and a copy would then be sent to the SAO. Witness interview transcripts were also generally given to Zayas and then distributed.

### Early Investigation

In the days immediately after Lockmiller's body was found, investigators conducted multiple interviews of people who might have information about the murder. Investigators determined Lockmiller had likely died on August 25, 1993, so investigators focused on that day.

Plaintiff was identified as a person of interest very early in the investigation. Although other individuals were investigated as possible suspects, Plaintiff emphasizes Freesmeyer's deposition testimony that Plaintiff became the prime suspect immediately, and Souk's testimony that he was the only suspect already on

the first day of the investigation. He and Lockmiller had previously had a romantic relationship, which ended about a month before the murder.

Plaintiff was interviewed by Daniels and Hospelhorn on the night of August 28, 1993, hours after Lockmiller's body was found. When asked about his whereabouts on August 25, he told them he had gotten home from work at 9 A.M. and went straight to bed. At the time, he was staying with his parents in Rockford, Illinois. It was discovered some time later that Plaintiff had been at Bell Federal Savings and Loan in Rockford at 10:11 A.M. on August 25, as confirmed by a videotape from the bank. During a later interrogation by Freesmeyer, when asked about his activities the week of the murder, Plaintiff started by recounting his activities on August 25. Plaintiff testified that he did that because his activities that day, an ice cream social and music rehearsal at his church and seeing a friend, stuck out in his mind. (Doc. 127 at 123).

One of the other individuals questioned by investigators was Lockmiller's neighbor, David Singley, who could hear through the walls to Lockmiller's apartment. He gave information to the police stating that after he came home from class at about 2 P.M. on August 25, he heard Lockmiller's door slammed shut, and then heard it open and close again five to ten minutes later. He told police he heard the stereo on inside Lockmiller's apartment the second time the door was open, and heard footsteps going downstairs and outside. He also told police that at about 4:30 P.M., he heard that the television had been turned on and the stereo turned off, and that the air conditioning was on by 5:15 P.M., though it had been off at 2 P.M.

Officers also spoke with Lockmiller's friends, including Morgan Keefe, who had found Lockmiller's body. Keefe gave information about some of Lockmiller's romantic partners, as well as some men she had met recently while out with friends. She told police about Plaintiff, including that he had previously broken down Lockmiller's door, and had threatened suicide if they broke up.

### Alternative Suspects

The other individuals that NPD officers investigated as possible suspects include Stacey "Bubba" Gates, Michael Swaine, Rob Curtis, and Larbi John Murray.

Lockmiller and Stacey "Bubba" Gates had been romantically involved between January 1991 and July 1993, when Lockmiller ended the relationship. He and Lockmiller had made plans to meet up the weekend of August 28, 1993, and Gates had believed they would be getting back together then, but he was worried she might back out.

Defendant Warner took a statement from Gates early in the investigation, and requested a polygraph. The polygraph of Gates was completed on September 8, 1993. Gates denied involvement with the murder, but the examiner reported the answers were "doubtful" or "inconclusive." (Doc. 133 at 38-39). Warner requested the polygraph report from the State Police Crime Lab, but there is a dispute as to what happened with it after that point. Warner testified he has no recollection of receiving it, but also has no reason to doubt that he did. As noted above, under standard procedure, Warner would have submitted the polygraph report to Zayas, who would have given it to the records section, and from there it would have been sent to the SAO. Warner testified that he believed the Crime Lab would have also

9

sent it directly to the SAO. However, Souk testified he never received the report (*See* Doc. 127 at 91).

Gates's alibi was that he was teaching at a school in Peoria on the day of the murder. The principal at the school where Gates worked, using a daily attendance sheet for recollection, told police that Gates was working from 8 A.M. to 4 P.M. that day. Defendants assert Gates was cleared as a suspect after his alibi was confirmed. Plaintiff disputes that Gates was ever fully eliminated as a suspect. (Doc. 127 at 91).

Michael Swaine, Plaintiff's roommate, also had a sexual relationship with Lockmiller beginning in June 1993 and continuing until her death. Initially, Freesmeyer was responsible for investigating Swaine as a suspect. He was cleared as a suspect because of his polygraph results and confirmation of his alibi early in the investigation. Thereafter, Swaine began to help Freesmeyer, recording conversations he had with Plaintiff.

A man named Rob Curtis was also investigated by police at some point in the investigation. He had attempted to date Lockmiller, but she had stood him up. Curtis also had a criminal history of torturing and killing cats. This criminal history was eventually found in some investigation files, but there is dispute as to how it got there, and Defendants deny ever having possessed it.

### *Larbi John Murray*

The most notable alternative suspect was Larbi John Murray. He and Lockmiller had an on-again, off-again sexual relationship. Murray, who was a drug dealer with some connection to a major dealer in Chicago, also sold drugs to

Lockmiller. At the time of her death, she owed Murray money for some marijuana he had sold her, approximately twenty dollars according to Murray. At the time of the murder, he lived in Bloomington, about 1.5 miles from Lockmiller's apartment.

Murray was interrogated by Officers Daniels and Hospelhorn on two occasions. During the first interview, on September 2, 1993, Murray told them he had spoken with Lockmiller and Swaine in a parking lot sometime between August 19 and 23, 1993, and that after that he visited Lockmiller's apartment, which was the last time he had seen her alive. He believed he left Bloomington, Illinois, for Byron, Illinois, on August 24 at 3 P.M. and had not returned to town until September 1. Murray also told them that Lockmiller still wanted to date him, and that she had told him she had been afraid to break up with Plaintiff.

A police interview a few days later with Murray's live-in girlfriend, Debbie Mackoway, yielded somewhat conflicting information. Mackoway told them she had been with Murray on August 25 from 2 P.M., when she got home from work, until 4:20 P.M., and thus he could not have left town until after that time. She confirmed that Murray had returned to town on September 1. She also stated she was with Murray when he saw Lockmiller on August 21, which was the last time she saw Lockmiller alive and she believed the same was true for Murray.

During the second interview with Murray, on September 8, 1993, he stated that he recalled the last time he saw Lockmiller was on August 21 in the parking lot, and that that encounter happened after he had been to Lockmiller's apartment. He stated that on August 25, the day of the murder, he was at home alone in the morning and early afternoon, and that he was with Mackoway from the time she got

11

home from work at 1 P.M. until he left for Byron, Illinois, at 4 P.M. Murray's phone records, later obtained by Daniels, confirmed that Murray was in Bloomington-Normal on August 25. Murray also told the officers about the money Lockmiller owed him. He offered to take a polygraph, and also told officers he and Mackoway had moved into a hotel because they were afraid of Plaintiff.

Daniels took Murray to the Morton Crime Lab for a polygraph on September 30, 1993. The examiner attempted the test but was unable to get a result because Murray did not follow directions despite being instructed multiple times. The directions Murray disobeyed included taking deep breaths that disrupted the examination, and sometimes failing to answer only yes or no. He eventually told the examiner he was not able to comply, and he was then dismissed. The examiner did not conclude that Murray had intentionally prevented a result, though the examiner stated in a postconviction hearing that not following directions can be an intentional response. Daniels testified that he did not notice any behavior during interrogations that would suggest Murray would be unable to complete a polygraph. Daniels discussed with Murray the possibility of trying again with a female examiner, and another polygraph was set up for October 12, 1993, but Murray did not show up for it.

Warner eventually received a report regarding Murray's polygraph, which was addressed to him. The facts as to what happened to the report after that point are disputed. Warner has testified that he gave it to Daniels and does not know what happened to it, but Plaintiff disputes that Daniels ever received it, as Daniels

has no memory of receiving it. (*See* Doc. 133 at 89-90). The SAO did not receive Murray's polygraph report.

Murray had a history of abusive behavior and use of steroids. Steroids were found in Murray's apartment during a search in January 1993, and he admitted to having used them on multiple occasions. In October 1994, Murray had two felony drug charges brought against him, as well as one domestic battery misdemeanor charge against him based on a complaint by Mackoway. Mackoway told police of past arguments and physical abuse by Murray, including elbowing her in the chest repeatedly. This report led to Murray's arrest and an order of protection. Also, Mackoway alleged Murray had been experimenting with steroid use, which made his behavior erratic. Souk undisputedly knew all of this information by the time of Plaintiff's trial.

### Investigation of Plaintiff

As noted above, the investigation was focused primarily on Plaintiff from an early stage. During the investigation, much information was obtained about Plaintiff's relationship with Lockmiller. They had previously dated for about two years prior to the murder, breaking up and reuniting several times, with the relationship ultimately ending about a month before the murder. Police learned of a history of loud arguments, including one that ended with Plaintiff drinking nail polish remover. Plaintiff had previously kicked in the door of Lockmiller's home on two occasions, which Plaintiff asserts was because she was with other men and trying to hide it from him. (Doc. 127 at 110). Despite this information indicating a tumultuous relationship, Plaintiff asserts the last time he saw Lockmiller after they

broke up, they left things on civil terms, and he began dating someone else in August 1993.

Seven fingerprints were found on the alarm clock, the cord of which had been used to strangle Lockmiller, two of which belonged to Plaintiff. Of the rest, four belonged to Swaine, and one was unidentified. Defendants did not run the unidentified print through an indexing system and do not know if anyone else did. Plaintiff had previously stayed the night at Lockmiller's apartment and used the alarm clock, which Souk testified was a reasonable alternative explanation for the presence of fingerprints. No suitable fingerprints had been removed from the alarm clock cord or the scissors that were used to stab Lockmiller.

Regarding Plaintiff's activities on the day of the murder, August 25, 1993, aside from the video of Plaintiff at Bell Federal Savings and Loan at 10:11 A.M. that day, phone records also showed two phone calls placed from Plaintiff's parents' home that morning, both lasting a short time, at 10:37 A.M. and 10:39 A.M. Plaintiff's argument is that he made those phone calls, though this is disputed. (Doc. 133 at 4-5). Driving time trials conducted by Freesmeyer indicate that using a bypass route around town, Plaintiff could have driven from the bank to the residence in twenty-five minutes, though this was not listed in Freesmeyer's report of the trials.[5] Plaintiff's mother testified that Plaintiff was at her home at 2:15 P.M., when she arrived there after being out.

---

[5] As noted above, the Court previously dismissed any claim based on failure to disclose the bypass time trial evidence, because Plaintiff had introduced evidence of bypass route times at his trial. (Doc. 48 at 6, 7-8, 30). However, simply because it cannot be the basis for a *Brady* claim does not mean the information is necessarily immaterial to Plaintiff's claims. Defendants' argument to the contrary is incorrect.

Freesmeyer also conducted time trials to determine how quickly Plaintiff could have gotten from Rockford to Bloomington-Normal and back. On at least one of these time trials, Souk accompanied Freesmeyer. These time trials showed that driving the speed limit, it would take two hours and seventeen minutes to drive from Lockmiller's apartment to the Beaman residence, or one hour and fifty-six minutes at an average speed of seventy-five miles per hour. If Plaintiff had left from the bank rather than the Beaman residence, time trials showed the round trip from the bank to Lockmiller's apartment to the Beaman residence would have taken four hours and eleven minutes driving the speed limit, or three hours and forty-four minutes driving an average speed of seventy-five miles per hour.

### Final Investigation Stages

In April 1994, Daniels attended a national police conference in Florida on cold case investigations. NPD Assistant Police Chief Walt Clark authorized Daniels to attend, and instructed him to present the Lockmiller case at the conference. While there, Daniels obtained a list of possible leads investigators could pursue in the case.

On May 16, 1994, several people involved in the investigation met to discuss the case. Zayas, Daniels, Freesmeyer, Reynard, and Souk were present. They discussed whether to arrest Plaintiff, though the tone of the meeting is disputed. Plaintiff argues Souk and Freesmeyer had already decided to arrest Plaintiff. (Doc. 127 at 103). Daniels testified that he suggested pursuing the list of leads from the April conference, but that this suggestion was rejected by Souk. (Doc. 127 at 105). Ultimately, the decision was made to charge Plaintiff with Lockmiller's murder.

Reynard made the final decision, and Souk agreed with it. Freesmeyer also supported the decision.

Plaintiff points to some evidence showing that not all of the investigators were completely approving of the decision, and that some believed there was not yet sufficient evidence. (Doc. 127 at 105-06). Several months after Plaintiff's arrest, Zayas held the opinion that there was still work to do to foreclose other suspects. In particular, Daniels was strongly opposed to the decision to arrest Plaintiff.

### Preparation for Trial

A grand jury indicted Plaintiff on July 14, 1994. The grand jury heard testimony from Freesmeyer, Plaintiff, and Plaintiff's parents, co-worker, employer, and church Youth Ministries director. During Freesmeyer's testimony, he gave two answers that Plaintiff highlights. First, in the discussion of interviews with residents of Lockmiller's apartment building, Freesmeyer answered affirmatively a question by Souk of whether it would "be a fair summary of those interviews that all of them produced no eyewitnesses to the crime and no information that turned out to be particularly helpful in the investigation." (Doc. 133 at 118). The inference Plaintiff urges from that statement is that Freesmeyer was untruthful or misleading, as it ignores or discounts the statements from Lockmiller's neighbor, Singley, about noises in her apartment that afternoon. Second, in response to Souk's question of whether, other than Plaintiff, he had been able to "locate any other person anywhere who had any conceivable motive to kill Jennifer Lockmiller," Freesmeyer answered "[n]o, not necessarily." (Doc. 133 at 119). Plaintiff cites the Murray evidence to argue this statement as untruthful.

Plaintiff's defense team consisted of attorney William Beu, who had been hired very early in the investigation and was lead counsel, attorney Rex Reu, and investigator Vern Pickett. According to Souk, it was policy that all non-privileged documents in the case file that the prosecutors received from police, the lab, or other sources, were turned over to criminal defendants' counsel. In December 1994, Plaintiff and his counsel attended a meeting at which Warner and Souk were present, to go over evidence and apparently to allow Plaintiff to see all of the evidence.

Trial preparation continued into 1995. Around January 1, 1995, Freesmeyer began working out of the SAO to begin to prepare for trial. The state had subpoenaed Murray for the trial and he was on their witness list. In fact, there was a flag on Murray's drug and domestic abuse cases indicating not to offer a plea deal without first speaking to Souk so the implications for Plaintiff's trial could be considered. However, the state eventually decided not to call him.

Souk filed a motion in limine before trial seeking to exclude reference to Lockmiller's sexual relationships other than with Plaintiff and Swaine. At a hearing on this motion in limine before the criminal trial, on February 27, 1995, Souk represented to the court that the state had no evidence in its possession that would allow Plaintiff to argue any other person could have committed the crime. The next day, Souk filed another motion in limine, to exclude evidence that someone besides Plaintiff was the murderer. Both of these motions were granted.

*Availability of Information to Plaintiff*

Plaintiff's attorneys did not receive the Murray or Gates polygraph reports, the reports surrounding Murray's arrest and protective order noting repeated domestic abuse, or the 1993 police reports about Murray's steroid use. Souk testified he did not believe the information relating to Murray to be Brady material. Plaintiff and his counsel also were not informed generally of the unpursued leads from the Florida conference or the dissent among investigators as to the readiness of the case for prosecution, or of Curtis's criminal history.

Despite not receiving all information about Murray from prosecutors, Plaintiff's counsel had some information about Murray as they prepared for trial. Beu knew generally that Murray had a romantic relationship with Lockmiller, had sold her drugs, and had a criminal history. Beu additionally had the disclosed transcripts of interviews between Daniels and Hospelhorn and Murray, including Murray's changed story of his whereabouts on the day of the murder and his offer to take a polygraph examination. Beu also learned of Murray's arrest in October 1994 for a felony drug charge. Beu testified he knew only of the marijuana-related charge from Murray's arrest in 1994, and did not receive information about the domestic violence or steroids.

As noted above, it was usual policy for the SAO to disclose whatever it received from the lab, and any non-privileged materials it had in its file. Beu was given reports showing other suspects were given polygraph examinations, including Swaine. The polygraph examiner testified that the lab would not provide polygraph reports without a subpoena, and that he could not remember any instance of a

criminal defense attorney attempting to obtain such reports from him. Beu did not interview any NPD investigators before trial.

### Trial

At trial, the defense theory was that Plaintiff was in Rockford at the time of the murder. Beu had researched alternative suspects, and wanted to introduce evidence indicating other individuals could have committed the crime, including evidence of Lockmiller's lifestyle and her relationships and contacts with other men. The trial court's rulings on the motions in limine precluded such evidence. Beu believed that had he received information about Murray's polygraph, steroids use, criminal background, and history of abuse, the judge would have been swayed to allow testimony presenting Murray as an alternative suspect.

During his closing argument, Souk argued Plaintiff arrived at Lockmiller's home just after noon on the day of the murder, and that he was out by about 12:15 P.M. The prosecution emphasized that every other suspect's alibi, including Swaine and Gates, had been proven except for Plaintiff's. The parties stipulated at trial that employment records showed Gates had been at work on the day of the murder.

### Post-Trial Efforts

After Plaintiff was found guilty and sentenced, Plaintiff's attorneys hired a private investigator, Tony Matens, in November 1996 to further investigate the murder. He obtained much of the evidence Plaintiff now alleges was withheld from him. Subsequently, Plaintiff pursued postconviction relief in the state courts. His efforts succeeded when, in 2008, the Illinois Supreme Court vacated Plaintiff's conviction. *People v. Beaman*, 890 N.E.2d 500 (Ill. 2008).

DISCUSSION

Under 42 U.S.C. § 1983, a plaintiff may bring a cause of action based on a deprivation of constitutional rights resulting from state action. *See*, *e.g.*, *Padula v. Leimbach*, 656 F.3d 595, 600 (7th Cir. 2011). Section 1983 liability is generally premised on the personal involvement of a defendant in the constitutional violation. *See, e.g.*, *Walker v. Rowe*, 791 F.2d 507, 508 (7th Cir. 1986); *Duckworth v. Franzen*, 780 F.2d 645, 650 (7th Cir. 1985).

In Count I, Plaintiff alleges Defendants, acting individually or in conspiracy, deprived him of a fair trial by withholding material exculpatory evidence from him, in violation of his due process rights. Counts II and III, though plead separately, are closely related to Count I, as they state essentially alternative bases for liability for the suppression of *Brady* material beyond specific intentional acts. Count II alleges a conspiracy to deprive Plaintiff of material exculpatory evidence, and Count III alleges a failure to intervene to prevent the violation of his rights in that manner. As explained herein, the many facets of these three claims fail for a variety of reasons—some of the undisclosed evidence Plaintiff complains of was not *Brady* material; other evidence was given to the prosecutor, thus discharging Defendants' *Brady* obligation; Plaintiff has not provided sufficient evidence of a conspiracy or of failure to intervene liability; and as to the one piece of evidence that may have been withheld from the prosecution in violation of Plaintiff's rights, Defendants are entitled to qualified immunity. As a result, because all federal claims are dismissed, the Court also declines to retain supplemental jurisdiction over the remaining claims.

## I.    *Evidence in Issue*

As a preliminary matter, the Court will address a dispute over what pieces of allegedly undisclosed evidence may properly form the basis of Plaintiff's *Brady* claims. In the Second Amended Complaint, Plaintiff alleges that Defendants caused material exculpatory evidence to be withheld, and that the evidence "includes but is not limited to" three specific pieces of evidence. (Doc. 69 at 19). These are 1) the report from the polygraph of Larbi John Murray, 2) police reports from Murray's arrest for domestic assault, and 3) the petition for order of protection filed by Mackoway against Murray. (Doc. 69 at 19). Plaintiff also includes at the end of that list "further and additional exculpatory evidence not yet known to Plaintiff." (Doc. 69 at 19).

In Defendants' Motion for Summary Judgment, they correctly anticipated that Plaintiff would rely on undisclosed evidence not listed in the Second Amended Complaint to show his due process rights were violated. Specifically, Plaintiff additionally points to 1) the report from the polygraph of Stacey "Bubba" Gates, 2) police reports from Rob Curtis's criminal history, and 3) the "Unsolved Nature of the Case and Additional Leads." (Doc. 127 at 169). Defendants complain that by basing his *Brady* claim in part on this evidence not listed in the operative pleading, Plaintiff is attempting to plead a new claim. Essentially, they argue that the only evidence that should be considered for the *Brady* claim is the evidence listed in the Second Amended Complaint, and that any allegation of additional withheld evidence is an improper new claim that would be untimely and any amendment to the pleading to add the claim would not relate back.

A recent Seventh Circuit decision, *Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2013), makes Defendants' argument highly doubtful. In *Jimenez*, the court found no error when new *Brady* theories of withheld evidence beyond evidence discussed during summary judgment were argued during trial. *Id.* at 718. In reaching this conclusion, the court stated:

> Contrary to the defendants' contention, these *Brady* theories were not stand-alone due process claims, and they certainly did not require Jimenez to amend his complaint in the middle of trial to add such factual detail to the pleadings. Defendants have not shown that they were unfairly blindsided or that Jimenez's trial evidence contradicted his discovery responses.

*Id.* This conclusion is consistent with pleading requirements. Parties are not required to plead specific facts. *See Benuzzi v. Bd. of Educ.*, 647 F.3d 652, 664 (7th Cir. 2011). Discovery may reveal additional facts in support of a claim, which a party may wish to use at a later stage. As in *Jimenez*, Defendants have not shown they were unfairly surprised by these facts; in fact, they expected Plaintiff to raise them in his Response, as he did. Thus, the Court finds nothing improper with Plaintiff pointing to additional pieces of evidence he alleges were also withheld from him during his criminal proceedings as evidence of a due process violation.

## II.     *Count I – Brady Violation*

Plaintiff claims Defendants violated his due process rights by withholding material exculpatory evidence from him during his criminal proceedings, and thus are liable under 42 U.S.C. § 1983. A prosecutor cannot suppress material evidence favorable to a criminal defendant. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). If a prosecutor withholds material exculpatory evidence, the defendant's due process right to a fair trial may be violated. *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir.

2001). Under the *Brady* line of cases, police officers also have a duty to turn over exculpatory evidence to the prosecutor. *See Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008); *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007); *Newsome*, 256 F.3d at 752.

### A.    *Brady Material*

A plaintiff must show three elements to prove a *Brady* violation: 1) the evidence must be favorable to the accused because it is exculpatory or impeaching, 2) it must have been suppressed, regardless of good faith, and 3) the evidence must have been material, meaning there is a reasonable probability that the result of the proceeding would have been different, which is also referred to as prejudice. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see also Carvajal*, 542 F.3d at 566-67. If numerous inferences are required for the evidence to be favorable to the accused, the first element is not satisfied. *See Harris*, 486 F.3d at 1016. Evidence suggesting an alternative perpetrator is usually considered exculpatory. *See Williams v. Ryan*, 623 F.3d 1258, 1265 (9th Cir. 2010).

Evidence is suppressed if "(1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005). The government has no obligation to conduct the defendant's investigation for him. *United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992). In *Ienco*, where a law enforcement database report could have been subpoenaed by defense counsel, it was not suppressed. 429 F.3d at 683. It is undisputed that the evidence at issue was not disclosed to Plaintiff's counsel by the

prosecution, so the only question is whether the evidence was otherwise available through reasonable diligence.

For the third element, evidence is material in the *Brady* context if there is a "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 470 (2009). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Thus, if confidence in the outcome of the trial is undermined by the reasonable probability of a different outcome, the evidence is material and the defendant suffered prejudice. *See id.* at 434-35. More than a "mere possibility" that the evidence could have helped the defense is required. *United States v. Agurs,* 427 U.S. 97, 110 (1976). The cumulative effect of all of the suppressed information is considered, *Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010), and the omission is "evaluated in the context of the entire record," *Agurs*, 427 U.S. at 112.

### 1.    *Curtis Criminal History*

Curtis's criminal history is not *Brady* material because it is not exculpatory, and even if it could be considered exculpatory, it is not material. The only link between Curtis and Lockmiller that Plaintiff cites is a statement he made after the murder that she had once stood him up for a date. Plaintiff seemingly argues Curtis was also a suspect, or should have been a suspect, in the investigation, and that because he has tortured animals in the past, he was a more likely suspect. But too

many inferences are required for this piece of evidence to be favorable to Plaintiff. Curtis's criminal record is not evidence inculpating him in the present case. An individual having a criminal past does not suggest he is the perpetrator of the current crime, particularly when the incidents are as unrelated and dissimilar as animal cruelty and murder. The evidence of Curtis's criminal history is thus not exculpatory, nor did it have any impeachment value, as he was not a witness. For similar reasons, the evidence would not be material. No judge would be persuaded that Curtis could have been presented as an alternative suspect simply because it was revealed he had once been involved in torturing animals, disturbing as it may be. Thus, this evidence is not *Brady* material.

### 2.    *Leads and Dissents*

Evidence of potential leads that were not pursued or evidence showing some investigators had doubts about Plaintiff's guilt is also not *Brady* material. The evidence Plaintiff points to seems to be opinions from certain officers that other suspects were not necessarily ruled out and that the case was not sufficiently strong against Plaintiff to proceed to trial, and a list of leads Daniels obtained from the Florida conference he attended. None of this is evidence that shows Plaintiff did not commit the crime. In any investigation, there are likely to be leads that are not pursued. Investigators must make decisions about how to use their resources to investigate cases. Further, the Court is aware of no authority requiring a prosecutorial decision to be unanimous, or creating an obligation under *Brady* to disclose any lack of unanimity. With the possible exception of the evidence about Murray, Plaintiff was given access to all of the material information that led some

investigators to form the opinion that the case was weak or remained unsolved. These opinions themselves are not also *Brady* material. Additionally, Plaintiff points to no impeachment value of the evidence, and the Court finds none.

The two cases Plaintiff cites to argue that evidence of leads or a lack of thoroughness in an investigation are *Brady* material are inapposite. In both cases, the evidence allegedly withheld was actual evidence indicating someone else had commit the crime, not a list of leads generated by police officers or vague opinions as to the status of the case. In one case, the evidence implicated an alternative suspect, *Bowen v. Maynard*, 799 F.2d 593, 600-13 (10th Cir. 1986), and in the other, the withheld evidence was an admission that another person had a contract out for a murder victim, *Mendez v. Artuz*, 303 F.3d 411, 412-13 (2d Cir. 2002). Both courts, in making brief gestures to the fact that such evidence also undermined the thoroughness of police investigations, were simply giving superfluous support to their conclusions, not explaining the basis for the exculpatory nature of the evidence. Accordingly, evidence of the "unsolved nature" of the case and leads that were not pursued need not have been disclosed to Plaintiff, and Defendants cannot be liable for withholding it.

### 3.    *Gates Polygraph*

The evidence that Gates could have been lying on his polygraph when he denied involvement in the murder suggests he could be an alternative perpetrator, and is thus exculpatory. However, it is not material. Defendants point out that Plaintiff stipulated at trial that Gates had been working at a school in Peoria the day of the murder, though presumably Plaintiff would not have agreed to such a

stipulation if he had been able to argue Gates was the perpetrator. Under the standard the trial court was applying when it excluded evidence of other suspects, the evidence pointing to an alternative perpetrator could not be too remote or speculative. Even if there was technically a possibility, which Freesmeyer did not pursue, that Gates left his place of employment, a school, during the day to murder Lockmiller, he would still have been only a speculative alternative suspect. It is highly unlikely the trial court would have been persuaded to allow evidence showing Gates was the actual murderer given his solid alibi and no other evidence to indicate his guilt. Thus, the evidence was not material and was not subject to disclosure under *Brady*.

### 4.    *Murray Evidence*

The evidence relating to Murray is *Brady* material, as it satisfies all of the elements.[6] Because it inculpates someone else, it is exculpatory. Though not strong evidence, taken together, Murray's erratic behavior from steroids, history of domestic assault including elbowing his girlfriend in the chest, and possible evasion during the polygraph, which he did not complete, suggest he could have been the culprit.

Defendant argues the evidence was not suppressed because Plaintiff should have discovered it with reasonable diligence. Plaintiff contends that because he was relying on the prosecution's representations that all non-privileged materials it had

---

[6] The Illinois Supreme Court determined on the merits that the evidence relating to Murray was *Brady* material that should have been disclosed to Plaintiff. Thus, this Court questions whether it may be collaterally estopped from relitigating that issue. The parties did not brief that point, and because the Court sees no basis for a contrary conclusion at this stage but finds the claim must be dismissed on other grounds, the Court need not resolve the issue.

were available to him, it was not unreasonable for his counsel not to obtain the withheld evidence. However, the cases he cites for that proposition all address a different, though perhaps related, question, of whether there was cause to excuse procedural default of a claim that allows a court to analyze it on habeas review. *See, e.g.*, *Strickler*, 527 U.S. at 284-85 (holding counsel's reliance on implicit representation from an open file policy that all exculpatory materials would be included satisfied to show cause for procedural default). Thus, the rule is not as clear-cut as Plaintiff asserts, though an open file policy by a prosecutor is likely relevant to the reasonable diligence inquiry.

Even with reasonable diligence, it would not have been expected that Plaintiff's counsel would have acquired the withheld Murray evidence. Regarding the Murray polygraph, Plaintiff's attorneys had an interview transcript showing Murray had agreed to take a polygraph examination and a report by Freesmeyer showing that he failed to show up for a scheduled polygraph on October 12, 1993. This was, in fact, to be his second polygraph, but the Court does not find it unreasonable if defense counsel concluded from the materials they had been given that there was no polygraph report to be had. Defendants' assertions that Attorney Reu may have communicated with Murray's attorney, or that he should have seen Murray's inaccurate representation in a newspaper article that he had passed a polygraph, do not suffice for the Court to conclude as a matter of law that Plaintiff's counsel could have discovered the polygraph with reasonable diligence.

Defendants make much of the fact that the polygraph report could have been obtained through subpoena of the crime lab where the examinations were done. It is

28

true that Seventh Circuit cases have indicated that a *Brady* violation cannot be found where the evidence is available to the defendant and his counsel through subpoena. *See, e.g.*, *United States v. Rodriguez-Andrade*, 62 F.3d 948, 952 (7th Cir. 1995). However, the rule cannot be as straightforward as Defendants assert, as virtually all evidence whose existence is known is obtainable by subpoena. It is more logical that even those documents would have to also satisfy the reasonable diligence standard. Because a jury could find that even with reasonable diligence Plaintiff's attorneys would not have discovered the Murray polygraph report, the fact that they were obtainable by subpoena if they had known if its existence is not dispositive.

The basis Plaintiff argues for his prejudice from the suppression of the Murray evidence is that had he been given the withheld evidence, he would have argued at trial that someone else had committed the murder, and this would have undermined the prosecution's case theory that all other suspects had been eliminated. (Doc. 127 at 155-56). Because of a ruling on the prosecution's motion in limine to exclude evidence showing that someone else could have committed the murder, Plaintiff was prevented from introducing evidence inculpating other suspects. This ruling was made based on the prosecution's representation to the court that there was no evidence that sufficiently pointed to other suspects. Plaintiff argues that with the additional evidence relating to Murray, the judge would have been swayed to allow evidence of other suspects. (Doc. 127 at 155-56). Defendants make no argument against the materiality of the Murray evidence in their Motion. (Doc. 110 at 17-25).

There is a reasonable likelihood the trial court would have allowed evidence of alternative suspects if presented with the suppressed evidence about Murray. When considered in light of the whole record, this evidence is fairly persuasive, and tends to show that another person could have committed the crime. Armed with Murray's documented drug abuse, domestic assault with possibly similar patterns, and erratic behavior from steroids, as well as a polygraph that Murray did not complete and the plausible inference that it was an intentional evasion, the evidence pointing to Murray may well have overcome the showing required for the trial judge to allow Plaintiff to argue another culprit, namely Murray, committed the murder. Considering the entire record, there was a reasonable likelihood of a different result, and this evidence is thus material.

Therefore, the only evidence that could properly be considered *Brady* material is the evidence relating to Murray, specifically his polygraph report, his domestic abuse records, and the protection order materials, which include information about his steroid abuse. As to all of the other evidence, as a matter of law, there was no constitutional violation even though it was not disclosed to Plaintiff, and Defendants cannot be liable for its suppression either directly or indirectly through conspiracy or failure to intervene liability.

### B.       *Officer Liability*

Under the *Brady* line of cases, police officers have a duty to turn over exculpatory evidence to the prosecutor. *See Carvajal*, 542 F.3d at 566; *Harris*, 486 F.3d at 1014. If they fail to do so, the accused's due process rights are violated. *See, e.g.*, *Newsome*, 256 F.3d at 752. However, "police need not spontaneously reveal to

prosecutors every tidbit that with the benefit of hindsight (and the context of other evidence) could be said to assist defendants." *Newsome v. McCabe*, 260 F.3d 824, 824 (7th Cir. 2001) (per curiam). Generally, for a defendant to be liable under § 1983, the plaintiff must prove personal involvement in the constitutional violation. *See Kelly v. Mun. Courts of Marion Cnty., Ind.*, 97 F.3d 902, 909 (7th Cir. 1996).[7] Joining multiple defendants in a single claim may pass muster under federal pleading requirements; however, at the summary judgment stage, Plaintiff is required to show, as to each Defendant, sufficient evidence of his personal involvement in the constitutional violation to allow a reasonable jury to find for Plaintiff against that Defendant. *See, e.g.*, *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).

Defendants argue that because the Illinois Supreme Court stated in its decision vacating Plaintiff's conviction that the State had conceded it knew of the Murray evidence, collateral estoppel precludes Plaintiff from now arguing the evidence was not disclosed to the prosecutor. Accordingly, Defendants argue, their duty to disclose the evidence to the prosecutor was discharged as a matter of law.

In determining the preclusive effect of a state court judgment, the law of the state from which the judgment came applies. *See Allen v. McCurry*, 449 U.S. 90, 96 (1980). Thus, Illinois issue preclusion law controls. Issue preclusion applies when:

> (1) the issue decided in the prior adjudication is identical with the one presented in the suit in question, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom

---

[7] Plaintiff alleges in Count I that Defendants are liable for acting "individually, jointly, and in conspiracy." (Doc. 69 at 19). For this discussion, the Court sets aside potential conspiracy liability, as that is discussed in conjunction with Count II, below.

> estoppel is asserted was a party or in privity with a party to the prior
> adjudication.

*Gumma v. White*, 833 N.E.2d 834, 843 (Ill. 2005). The issue must have been actually litigated in the prior case, and "a decision on the issue must have been necessary to the judgment." *Am. Family Mut. Ins. Co. v. Savickas*, 739 N.E.2d 445, 451 (Ill. 2000).

Defendants point to a statement in the Illinois Supreme Court's decision, referring to the Murray evidence: "In its brief to this court, the State does not dispute that it knew of the evidence and failed to disclose it." *Beaman*, 890 N.E.2d at 511. However, Defendants overlook a distinction between the analysis of *Brady* violations in collateral attacks to convictions and in § 1983 litigation. When determining whether a *Brady* violation entitles an accused to have his conviction overturned, as noted by the Illinois Supreme Court, it does not matter whether the prosecutor knew of the evidence or whether it was known only to police investigators. *See Kyles*, 514 U.S. at 437-38. Knowledge of the evidence is imputed to the prosecutor even if only the police possessed it. *See id.*; *United States v. Mota*, 685 F.3d 644, 648 (7th Cir. 2012); *United States v. Wilson*, 237 F.3d 827, 832 (7th Cir. 2001). Thus, when the Illinois Supreme Court determined that the State knew of the evidence relating to Murray, it was not distinguishing between the prosecutor and the police, because any material exculpatory information known to either should have been disclosed, and the failure to disclose would be constitutional error regardless of who technically was to blame.

In contrast, it is critical to the analysis of Plaintiff's § 1983 *Brady* claim to determine whether the prosecutor knew of the evidence, or whether the police failed

32

to disclose it to him. Thus, the issue in the present case is not identical to the issue before the Illinois Supreme Court, and issue preclusion does not bar litigation of whether Souk himself knew of certain evidence or whether it was known only to investigators.

Turning to the question of whether Defendants withheld any evidence from the prosecution, the undisputed facts show that most of the Murray evidence was not withheld from the prosecutor. It is undisputed that the police reports from Murray's domestic assault and the papers about the protective order against him were known to Souk. Thus, none of this evidence can be the subject of the § 1983 *Brady* claim under the theory of liability for their individual actions, as Defendants did not suppress the information from the prosecutor. Plaintiff essentially concedes as much in his Response. (Doc. 127 at 153). Because the evidence of Murray's domestic assault and protection order were known to Souk, Defendants could only be liable if they conspired with him to conceal those particular pieces of evidence, which is addressed below. However, it is undisputed that Souk did not receive the Murray polygraph report.

Even for this polygraph, Defendants argue there is no evidence of intentional suppression from the prosecutor. Negligence or even gross negligence do not create a due process violation actionable under § 1983. *Slade v. Bd. of Sch. Dirs.*, 702 F.3d 1027, 1032 (7th Cir. 2012); *see also Daniels v. Williams*, 474 U.S. 327, 330-31 (1986). Plaintiff points to disputes of fact as well as undisputed facts that it argues could allow the jury to infer intentional suppression of evidence by Defendants. (Doc. 127 at 160-64).

As Plaintiff notes, there is of course no admission by any of the Defendants of an intentional suppression of evidence. Thus, to some extent, Plaintiff must rely on indirect evidence. The case law Plaintiff cites to support his proposition that indirect evidence can prove intent is not exactly on point, all relating to other types of cases in which some form of intent must be proven. Though citing a rule used in discrimination cases, Plaintiff argues, for example, that intent could be inferred from significant and unexplained deviations from policy. *See Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 645 (7th Cir. 2013). Even if not on point, the general idea is analogous, and Plaintiff need not have direct proof of an intentional suppression of this polygraph.

Based on the undisputed facts in the record, there are multiple inferences a jury could reach. A jury could well conclude the failure to turn the polygraph report over to the prosecutor was a negligent mistake. However, taking the evidence in the light most favorable to Plaintiff, he has pointed to sufficient evidence to support an alternative inference that at least one of the three individual Defendants intentionally withheld the information from Souk. The only officer that undisputedly had the polygraph report in his possession at any point is Warner. Under NPD policy, the polygraph reports would then be given to Zayas, who would give them to the records department and ensure a copy was given to the prosecutor. However, for reasons unknown, this policy was not followed with the Murray polygraph, and the parties dispute what happened to it once received by the NPD. Warner claims he gave it to Daniels instead of Zayas, but Daniels has no recollection of ever receiving the report. A jury could infer from the failure to follow

34

policy and the conflicting testimony that there was intentional suppression of the evidence by Warner, the only Defendant shown by the record to have possessed the polygraph report. However, absent an admission by Warner, there is a disputed issue of fact that can only be resolved by trial, and Plaintiff's claim of the violation of his due process rights for withholding the Murray polygraph from the prosecutor as stated against Defendant Warner cannot be resolved as a matter of law. Regarding the Defendants Freesmeyer and Zayas, on the other hand, there is no evidence that either of them ever possessed the report. Therefore, Plaintiff having shown insufficient evidence that Freesmeyer or Zayas was personally involved with the suppression of the Murray polygraph, summary judgment is allowed on the due process claim asserted in Count I against all Defendants except Warner.

### III.   *Count II – Conspiracy*

In Count II, Plaintiff alleges liability based on a conspiracy between Defendants and Souk to withhold exculpatory evidence from him. Thus, even for the Murray evidence that was known to the prosecutor, Plaintiff argues Defendants may still be liable for its suppression because of their role in the conspiracy to withhold it. For a plaintiff to establish conspiracy liability in a § 1983 claim, he must show that 1) the individuals reached an agreement to deprive him of his constitutional rights, and 2) overt acts in furtherance actually deprived him of those rights. *See Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988). The conspirators need not have known the precise limits of the plan, but must have shared the same objective to violate constitutional rights and agreed to the general nature and scope of the conspiracy. *See Green v. Benden*, 281 F.3d 661, 665-66 (7th Cir. 2002);

35

*Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979), *rev'd in part on other grounds,* 446 U.S. 754 (1980).

Circumstantial evidence may be used to prove a conspiracy, but the evidence must not be speculative. *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003). The circumstantial evidence must be "sufficient to permit a reasonable jury to conclude that a meeting of the minds had occurred and that the parties had an understanding to achieve the conspiracy's objectives." *Green*, 281 F.3d at 666. For example, the Seventh Circuit has concluded that frequent phone calls do not prove a conspiracy, they only prove that individuals were in contact. *E.g.*, *Alexander v. City of South Bend,* 433 F.3d 550, 557 (7th Cir. 2006); *Goetzke v. Ferro Corp.*, 280 F.3d 766, 778 (7th Cir. 2002). Also, a person's supervisory position cannot be the basis for an inference that he was involved in the conspiracy. *Bell v. City of Milwaukee,* 746 F.2d 1205, 1255 (7th Cir. 1984), *overruled on other grounds by Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005). Joint pursuit of an investigation based on a belief a suspect is guilty is not an unlawful conspiracy. *See Reasonover v. St. Louis Cnty., Mo.*, 447 F.3d 569, 582 (8th Cir. 2006). The Court knows of no authority indicating that flaws in an investigation are evidence of a conspiracy. *See Kunz v. City of Chicago*, 234 F. Supp. 2d 820, 824 (N.D. Ill. 2002) (reaching same conclusion).

A police officer's duty to disclose exculpatory evidence is not discharged by disclosure to a prosecutor conspiring with the police officers to fabricate evidence. *Whitlock v. Brueggemann*, 682 F.3d 567, 576 (7th Cir. 2012), *cert. denied,* 133 S. Ct. 981 (2013). Plaintiff alleges that Defendants and Souk, and perhaps others, were engaged in a conspiracy to deprive Plaintiff of the evidence at issue, and thus, even

if Souk knew of the evidence of Murray's domestic abuse, drug arrest, and erratic behavior from steroid use, Plaintiff argues Defendants may still be liable because of their role in the conspiracy to suppress it or, relatedly, because their *Brady* duty was not satisfied by disclosing the evidence to a co-conspirator.

The evidence Plaintiff cites to support his conspiracy theory can be put into six general categories. (*See* Doc. 127 at 144-45). First, there is evidence of a "high level of information sharing," including frequent meetings, exchange of reports, and close contact among the investigators. Second, Freesmeyer and Souk believed Plaintiff was the primary suspect almost immediately. Third, there is evidence that some of the investigators, including one of the alleged conspirators, Zayas, believed the case was not ready to be prosecuted even as late as November 1994. Fourth, Plaintiff points to Freesmeyer's grand jury testimony, directed by Souk, which he characterizes as dishonest. Fifth, Plaintiff argues, supported by some evidence, that the conspirators faced strong incentives to resolve the case, including that Freesmeyer, as lead investigator, would receive most of the credit for solving the case and most of the blame if it went unsolved, and that Souk later used his prosecution of this case in campaign materials when running for a judicial seat. Sixth, Plaintiff cites evidence of Souk and Freesmeyer's friendship. Plaintiff also points to overt acts each of the conspirators committed to further the conspiracy, most importantly that each of the Defendants could have played a role in the unexplained disappearance of the Gates and Murray polygraphs.

Even taken together and drawing inferences in Plaintiff's favor, none of the evidence Plaintiff cites is enough to be more than speculative evidence of a

conspiracy: A jury could not reasonably infer that Defendants conspired among themselves and with Souk with the common goal of suppressing evidence from Plaintiff. Most of the evidence Plaintiff cites is evidence that Defendants worked closely together and with Souk to investigate the Lockmiller case. This does not show conspiracy; it only shows they were doing their job. Working relationships or even friendships between individuals do not support a conspiracy claim. Zayas's view that the case was not ready to be prosecuted could indicate his consent to go along with the prosecution despite its weaknesses, but does nothing to prove an agreement to withhold evidence from Plaintiff. Freesmeyer's grand jury testimony with Souk's knowledge, even if arguably misleading, is not evidence of a conspiracy. They collaborated on the testimony as part of their jobs. The fact that Freesmeyer did not find the Singley statements helpful, or that he believed Plaintiff should be prosecuted and that no other suspects had a motive, do not indicate he agreed with others to violate Plaintiff's constitutional rights.

Plaintiff need not have a smoking gun, but he must have more than evidence that simply shows circumstances that are likely present in most or all complex police investigations and prosecutions—collaboration, dissenting views, and incentives to solve the case. At most, Plaintiff's evidence shows Defendants and Souk worked closely to pursue the investigation and prosecution, even if wrong in their belief that Plaintiff was the perpetrator and even if the investigation had flaws. That is not an unlawful conspiracy. Thus, Count II is dismissed.

### IV.    *Count III – Failure to Intervene*

Finally, Plaintiff alleges Defendants may be liable on the basis of their failure to intervene to prevent the withholding of material, exculpatory evidence. Failure to intervene liability arises when an officer had reason to know that a constitutional violation was committed and had a realistic opportunity to intervene to prevent the violation, but did not. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).

Defendants' argument against this basis of liability is that the Defendants worked independently, and there is no evidence that they were aware of each other's actions. Though Defendants' argument is sparse, the Court agrees that there is quite simply no indication that any one of the Defendants was aware of a violation by any of the other Defendants and failed to avail himself of an opportunity to prevent it. The present case is distinguishable from much of the case law on failure to intervene liability, often involving officers witnessing excessive force or unlawful arrest by a fellow officer. *See, e.g.*, *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). A key step in finding a failure to intervene is a violation by a particular individual. *See id.* Here, as the discussion above indicates, the only violation arguably shown by the evidence is that Warner failed to disclose the Murray polygraph to the prosecution. Even for this alleged violation, there is no evidence to indicate other Defendants were aware of this suppression of evidence and able to intervene. Thus, Defendants cannot face liability on this basis, and Count III is dismissed.

## V.  *Qualified Immunity*

The only violation thus remaining to be considered is the possible violation by Defendant Warner suppressing the Murray polygraph report from the prosecution. However, even if there was a violation of Plaintiff's rights in this regard, Defendants argue they are entitled to qualified immunity, and any claims against them not dismissed on other grounds should be dismissed on the basis of qualified immunity.

Under the qualified immunity doctrine, government officials are entitled to protection from damages liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Courts must undertake a two-step inquiry to determine whether officials are entitled to qualified immunity. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). First, the court must determine whether, taking the evidence in the light most favorable to the complaining party, there is evidence that would allow for a finding of a constitutional violation. *See id.* Second, the court must determine whether the right was "clearly established" at the time of the alleged misconduct. *Id.* Courts may address the steps in any order. *Id.* at 236.

As the discussion above indicates, Plaintiff has provided sufficient evidence of a violation of his constitutional rights for the failure to disclose the Murray polygraph to the prosecution. Thus, the first inquiry in qualified immunity analysis is completed, and Plaintiff has shown facts that make out a violation of his due

process right to the disclosure of material exculpatory evidence. The Court must now determine whether the right was clearly established at the time of the conduct.

There are two ways a plaintiff can show a right is clearly established: "(1) he can point to an analogous case establishing the right to be free from the conduct at issue; or (2) he can show that the conduct was 'so egregious that no reasonable person could have believed that it would not violate clearly established rights.'" *Steidl v. Fermon*, 494 F.3d 623, 632 (7th Cir. 2007) (quoting *Smith v. City of Chicago,* 242 F.3d 737, 742 (7th Cir. 2001)). Even if factual circumstances are novel, a right can still be clearly established, so long as the state of the law at the time gave the defendants fair warning that their conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Put another way, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). To properly apply this standard, the court must consider the alleged violation with a certain level of factual specificity. *See, e.g.*, *Steidl*, 494 F.3d at 627. Thus, for a *Brady* violation, the inquiry is not whether an officer would clearly know he had an obligation to disclose exculpatory information to the prosecution; rather, the question is more fact-specific, and it must have been clear that an officer would have been expected to disclose the particular piece of evidence. *See Carvajal*, 542 F.3d at 569-70.

Defendants acknowledge that law enforcement officers' general *Brady* obligation was clearly established, but argue that the law at the time of the conduct had not clearly established more specifically that polygraph reports had to be

41

disclosed.[8] Defendants point primarily to a Supreme Court case from 1995, a few months after the Beaman trial concluded, in which the Court held that a polygraph report that was not admissible in evidence for any purpose was not material and did not have to be disclosed under *Brady*. *Wood v. Bartholomew*, 516 U.S. 1, 8 (1995). With some exceptions that Plaintiff does not argue apply here, evidence of polygraph reports are also inadmissible in Illinois. *See People v. Jefferson*, 705 N.E.2d 56, 62 (1998). Thus, even if the evidence could have impacted the proceeding through the circuitous route of persuading the judge to allow at trial other evidence that Murray was the real perpetrator of the crime, which could have provided reasonable doubt necessary for an acquittal, it was not unreasonable for officers to believe it was not *Brady* material. Given the very limited use of polygraph reports at trial under state law, the Court concludes a reasonable officer could have the belief that the Murray polygraph would not be material evidence. Thus, because it was not clearly established that polygraph reports would have to be disclosed under *Brady* at the time of Defendant Warner's alleged conduct, he is entitled to qualified immunity on this claim.

Therefore, Plaintiff's only *Brady* claim that does not fail for lack of evidence of a violation is barred by qualified immunity. Defendant Warner cannot be liable for the *Brady* violation that Plaintiff alleges. For this reason and others explained above, Counts I, II and III are dismissed.

---

[8] Defendants attempt to further narrow the inquiry, to one of whether there was an obligation to disclose a polygraph of a person who had been ruled out as a viable suspect. But the Court finds it inappropriate to give such weight to the prosecution's determination of who was a viable suspect. Perhaps if the prosecutor had received the polygraph report, he would no longer have agreed Murray was not a viable suspect.

## VI.    *Remaining Claims*

With the first three counts dismissed, all that remain are state law claims and counts alleging liability for the Town of Normal. These claims must also be dismissed.

For Counts IV, V, and VI, based in Illinois law, because the parties are not diverse, the Court's only basis for jurisdiction is 28 U.S.C. § 1367, providing for supplemental jurisdiction over state law claims related to a case properly in federal court. When federal claims are resolved before trial, the general rule is that federal courts should decline to retain supplemental jurisdiction over state law claims. *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). There are some exceptions to the rule, such as when judicial economy supports retaining jurisdiction. *Id.* However, none of them apply in the present case. Thus, the Court declines to retain jurisdiction over Plaintiff's state law claims, and they are dismissed without prejudice.

Counts VII and VIII are alleged merely to create liability for the Town of Normal for Defendants' behavior. Because the Court has concluded that Defendants are not liable, there is nothing to indemnify. Further, respondeat superior liability does not apply to the federal § 1983 claims. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 693-95 (1978). Thus, these counts are also dismissed.

### CONCLUSION

For the reasons above, Plaintiff's claims of a *Brady* violation fail. Most of the evidence Plaintiff did not receive at his criminal trial was not *Brady* material, and the undisputed facts show that most of it that was *Brady* material had been

disclosed to the prosecution, thus satisfying Defendants' obligations. Plaintiff did not present evidence sufficient for a jury to find a conspiracy to deprive him of his rights existed or that Defendants are subject to failure to intervene liability. Even regarding the Murray polygraph report, the *Brady* material withheld from the prosecution possibly by Defendant Warner, because the constitutional right that may have been violated was not clearly established at the time of his action, he is entitled to qualified immunity. All other claims are also dismissed, as the Court declines to retain supplemental jurisdiction over the state claims and there is no basis for municipal liability.

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (Doc. 109) is GRANTED. Counts I, II, and III, are DISMISSED WITH PREJUDICE. Counts IV, V, VI, VII, and VIII are DISMISSED WITHOUT PREJUDICE. Further, the other Motion for Summary Judgment (Doc. 97), filed by Defendants John Brown and McLean County, Illinois, is DENIED AS MOOT. CASE TERMINATED.


Entered this <u>2nd</u> day of January, 2014.


s/ Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge